Joe A. LIBBRA, Vicki L. Libbra, Troy A. Libbra, Todd A. Libbra, Plaintiffs,

v.

The CITY OF LITCHFIELD, ILLINOIS, Kathryn Dobrinic, Dorothy Mansholt, William Dolahite, Defendants.

No. 93–3137.

United States District Court, C.D. Illinois, Springfield Division.

July 20, 1995.

---

Michael W. Ochoa, Springfield, IL, for plaintiffs.

Patrick J. Londrigan, Springfield, IL, John E. Cassidy, Jr., Peoria, IL, for defendants.

## OPINION

RICHARD MILLS, District Judge:

The conduct of the Libbra family is revolting and disgraceful!

Summary judgment is entered for all Defendants.

Case closed.

## BACKGROUND

At all times relevant to the instant motion, Plaintiffs Joe, Vicki (wife of Joe), Todd, and Troy (sons of Joe and Vicki) Libbra were residents in a home at 822 East Union Street, Litchfield, Montgomery County, Illinois; Defendant Katherine Dobrinic was

State's Attorney for Montgomery County, Illinois; Defendant Dorothy Mansholt was Mayor of the City of Litchfield, Illinois; and Defendant William Dolahite was the Litchfield City Chief of Police.

The Libbras moved to the City of Litchfield sometime during the middle of 1989. They rented their home at 822 East Union Street from David and Rebecca Joudah. Sometime during 1990, Joe Libbra began posting signs in his yard critical of public, including the named Defendants, and private individuals. Examples of a few of Joe Libbra's signs include: "Has newspaper owner been accused of fondling boys? Ask him;" "Ms. Mayor and superintendent having an affair;" "Did city attorney get AIDS Debbie's whorehouse;" and "Miss D.A. needs line coke."

On December 12, 1990, at approximately 3:30 a.m., someone set fire to the Libbras' signs (the signs that were set afire are not the signs mentioned in the preceding paragraph). The cause of the fire has never been determined.

On June 4, 1990, as a result of David and Rebecca Joudahs' (the record title holders of the Libbras' home) failure to maintain their monthly mortgage payments, America's Mortgage Company filed a complaint for foreclosure in Montgomery County against the Joudahs and twelve lien holders. The Libbras were *not* named in the foreclosure action. On September 13, 1990, America's Mortgage Company, through its attorney, Nancy Handegan, requested a hearing on its complaint for foreclosure. The Joudahs failed to appear and were consequently defaulted. Circuit Judge John P. Coady of the Montgomery County Circuit Court entered an order allowing the judgment and sale of the property. On February 14, 1991, Judge Coady subsequently entered an order confirming the sale of the property. Judge Coady's order also authorized the Sheriff of Montgomery County to obtain and turn over possession of the Libbras' residence to America's Mortgage Company on or after March 16, 1991.

On March 26 and in May of 1991, the Libbras were served with Judge Coady's order authorizing the sheriff to turn over pos-

session of their residence to America's Mortgage Company. The Libbras failed to vacate the property. Because the Libbras would not voluntarily vacate the premises, America's Mortgage Company intended to evict them on June 3, 1991. However, prior to that date, Attorney Handegan spoke to Joe Libbra and he agreed to vacate the premises by June 15; the eviction was therefore postponed.

On the morning of June 18, 1991, as a result of the Libbras' failure to vacate the premises, a moving company hired by America's Mortgage Company proceeded to remove the Libbras' possessions from their residence. Immediately thereafter, the Libbras, *pro se*, petitioned Judge Coady for an emergency hearing. Later that day, an emergency hearing was held before Judge Coady. Judge Coady, apparently concerned that the ejectment of the Libbras was improper because they were never made a party to the foreclosure proceeding against the Joudahs, ordered America's Mortgage Company to cease the eviction process. A hearing on the Libbras' right to possess the property was set for June 27, 1991.

On June 27, Judge Coady determined that the Libbras had no right to possess the property. Consequently, he entered an order directing the Libbras to vacate the premises by July 18, 1991. The Libbras did not appeal that order.

Sometime during late 1990 or early 1991, police officers from the City of Litchfield were directed to take pictures of the Libbras' signs. This generally occurred on a daily basis, for fifteen to thirty minutes at a time, until the Libbras were evicted from their residence.

On June 20, 21, 22, and 23 of 1991, the City of Litchfield issued tickets to Joe Libbra, charging him with a violation of the City's zoning ordinance. The Libbras continued to post signs at their residence on Union street until they were evicted on July 18, 1991. Following the eviction, from July to December 1991, the Libbras resided with Joe Libbra's mother. No signs were posted at the mother's residence. In December 1991, the Libbras moved from their mother's residence

to another home in Litchfield and immediately began posting signs again. The Libbras posted signs until Joe Libbra agreed to stop as part of his probation agreement for a felony conviction for intimidation in 1993. The four zoning ordinance tickets issued to Joe Libbra in 1991 were never prosecuted and were dismissed for want of prosecution on March 10, 1994.

### LEGAL STANDARD—SUMMARY JUDGMENT

Under Fed.R.Civ.P. 56(c), summary judgment shall be granted if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Black v. Henry Pratt Co.,* 778 F.2d 1278, 1281 (7th Cir.1985). The moving party has the burden of providing proper documentary evidence to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Unquestionably, in determining whether a genuine issue of material fact exists, the evidence is to be taken in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials of the pleadings, which demonstrates that there is a genuine issue for trial. *Howland v. Kilquist,* 833 F.2d 639 (7th Cir.1987). Furthermore, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

### DISCUSSION/ANALYSIS

The Libbras initiate this action under 42 U.S.C. § 1983 alleging violations of their First Amendment rights.[1] In order to establish a successful § 1983 claim, the Libbras must show (1) that the conduct complained of was committed by a person acting under color of state law and (2) that this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States. *New Burnham Prairie Homes v. Village of Burnham,* 910 F.2d 1474, 1479 (7th Cir.1990). Since Defendants do not dispute that they acted under the color of state law, the issue under § 1983 is whether the Libbras were deprived of rights secured by the Constitution.

The Libbras characterize their claim against Defendants as a conspiracy to deprive them of their First Amendment guarantee of freedom of speech. However, based on the allegations of the complaint and the pleadings in this matter, it appears more accurate to characterize this action as a conspiracy to retaliate against the Libbras for exercising their First Amendment rights.[2]

### I

Section 1983 does not punish conspiracy, *Goldschmidt v. Patchett,* 686 F.2d 582, 585 (7th Cir.1982), rather, as a practical matter, proof of a civil conspiracy simply broadens the scope of liability under § 1983

---

1. The Libbras also claim that they have an actionable claim under 42 U.S.C. § 1985(3). However, in evaluating the viability of claims under § 1985(3), "the Supreme Court has required that 'there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirator's action.'" *Triad Associates, Inc. v. Chicago Housing Authority,* 892 F.2d 583, 592 (7th Cir.1989) (citing *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971)). Since neither the complaint nor any other pleadings in this matter allege the deprivation of a constitutional right motivated by a racial or class-based discriminatory animus, the Libbras have no claim under § 1985(3).

2. Throughout our opinion, we will refer to the First Amendment rather than to the First and Fourteenth Amendments. The First Amendment has been made applicable to the states through the Fourteenth Amendment and it is the Fourteenth Amendment that applies to state, not federal actors.

to include individuals who were part of a conspiracy but did not act directly to deprive a plaintiff of his or her constitutional rights. *Miller v. Village of Dolton,* No. 94–C–765, 1995 WL 137051, *5, LEXIS 3892, *16 (N.D.Ill. Mar. 27, 1995). In order to establish a prima facie case of a civil conspiracy, "a plaintiff must show (1) an express or implied agreement among defendants to deprive plaintiff of his or her constitutional rights and (2) actual deprivations of those rights in the form of overt acts in furtherance of the agreement." *Scherer v. Balkema,* 840 F.2d 437, 442 (7th Cir.1988). Because we conclude that the Libbras were not deprived of any constitutional rights by the alleged conspirators (element # 2), we need not decide whether they have provided sufficient evidence of an express or implied agreement amongst those conspirators.

## II

As previously indicated, we construe the pleadings in this matter as alleging that Defendants conspired to retaliate against the Libbra family for exercising their First Amendment right to freedom of speech. Specifically, as a result of posting signs in their yard critical of public and private individuals, the Libbras claim that they were retaliated against and harassed by Defendants.[3] Assuming the content of the signs qualifies as protected speech and the Libbras were in fact retaliated against, such a claim is undoubtedly actionable under § 1983. *Smart v. Board of Trustees of Univ. of Illinois,* 34 F.3d 432, 434 (7th Cir.1994) ("Any form of official retaliation for exercising one's freedom of speech is actionable as an infringement of that freedom."); *Rakovich v. Wade,* 850 F.2d 1180, 1211 (7th Cir.1988) ("[A]n act in retaliation for the exercise of a constitutionally protected[, for example, a first amendment interest,] is actionable under § 1983.").

As evidence of Defendants' retaliatory conduct, the Libbras identify four events: (1) their signs were set ablaze; (2) they were "illegally" evicted from their home; (3) the Litchfield Police Department parked their automobiles in front of their residence and

photographed the signs; and (4) the Litchfield Police Department issued four tickets to Joe Libbra for violating a residential zoning ordinance. We will discuss whether these events qualify as retaliatory conduct, but, we must begin our analysis of the Libbras' claim with the threshold question posed in any suit alleging a violation of the First Amendment; namely, whether the speech at issue is protected. *Hedges v. Wauconda Community Unit School Dist.,* 807 F.Supp. 444, 453 (N.D.Ill.1992).

## III

Of course, determining whether the speech at issue qualifies as protected speech presents many interesting issues. At this point, the Court notes that our independent research could not uncover a reported case factually and legally similar to the instant action. Consequently, we are writing on a clean slate with respect to several of the issues presented in this matter. Regardless, based on the established precedent derived from somewhat analogous § 1983 First Amendment cases, we are confident that our resolution of the issues is in harmony with First Amendment jurisprudence.

The first issue concerns which party has the burden of proof in a case of this nature. The Libbras raised this issue in a motion *in limine,* and in our order of June 22, 1995, we concluded that they, as plaintiffs, have the burden of establishing that the speech at issue qualifies as protected speech. To summarize our prior holding, the Libbras initiated this case under § 1983 and as an element of such a claim, they must establish that Defendants' conduct deprived them of a right secured by the Constitution. Of course, since not all speech is protected, *R.A.V. v. City of St. Paul,* 505 U.S. 377, 406, 112 S.Ct. 2538, 2555, 120 L.Ed.2d 305 (1992) (White, J., concurring) ("[T]he First Amendment does not apply to categories of unprotected speech."), the Libbras cannot claim that they were deprived of a Constitutional right until and unless they establish that they were engaged in speech protected under the First Amendment, *i.e.,* establishing a

---

**3.** The damages claimed from the alleged retaliation consists of emotional distress.

Constitutional—First Amendment—deprivation is a part of their prima facie case. Accordingly, it seems clear that the Libbras are burdened with the task of convincing the Court that the content of their signs qualifies as protected speech and thus enjoys Constitutional protection.[4] *See Caldwell v. City of Elwood,* 959 F.2d 670, 672 (7th Cir.1992) (In the context of a public employee alleging that he was retaliated against for exercising his First Amendment guarantee of free speech, the public employee must establish "that the speech [he] engaged in was constitutionally protected under the circumstances."); *Brookins v. Kolb,* 990 F.2d 308, 313 (7th Cir.1993) (In a case involving a prisoner who claimed prison officials retaliated against him for exercising his First Amendment rights, the Seventh Circuit stated that "[plaintiff] has not demonstrated that the speech contained in his letter rose to the level of protected speech."); *Clayton–El v. Caraway,* 1992 WL 266023, *3, No. 90–2251, LEXIS 25727, *8 (7th Cir. Oct. 6, 1992) ("[Plaintiff] cites no authority for the proposition that 'smart mouthing' and 'cursing' at prison guards are forms of speech that enjoy protection under the First Amendment.").

■ Allocating the burden of establishing the protected status of the speech to the Libbras, however, leads to a peculiar predicament as a result of the arguments raised in this matter. That is, in arguing that the content of the Libbras' signs is not protected speech, Defendants resort to the law of defamation, slander, and libel claiming that the signs contain false, baseless, and unfounded accusations. As a general statement, it is true that if the Libbras acted with "actual malice," *i.e.,* knowledge of the falsity of their statements or reckless disregard of whether their statements were true or false, *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–280, 84 S.Ct. 710, 725–726, 11 L.Ed.2d 686 (1964), their speech does not enjoy First Amendment protection. *See Brenner v.*

*Brown,* 36 F.3d 18, 20 (7th Cir.1994) ("[S]peech is not protected where it is[ ] made with a reckless disregard for the truth. . . .").

The "actual malice" inquiry as to whether speech enjoys Constitutional protection developed in the context of public officials initiating defamation claims as a result of alleged defamatory statements relating to their official conduct. However, in cases of that nature, the public official—as the plaintiff, of course—has the burden of proof as to whether the particular statement was made with actual malice. But here, because the Libbras, as plaintiffs, are initiating this action under § 1983, they must establish a Constitutional deprivation and no such deprivation results unless their speech is protected under the First Amendment. Thus, the Libbras must come forward with evidence that their derogatory statements directed at numerous public and private individuals were *not* made with actual malice. Otherwise, they have failed to establish that their speech enjoys First Amendment protection.

At first glance, the fact that the Libbras are burdened with the task of establishing that their statements were *not* made with actual malice, yet, if the Libbras were named as defendants in defamation actions brought by the "targets" of their signs, those individuals—not the Libbras—would have to establish that the statements were in fact made with actual malice in order to prevail, may appear troubling. However, we believe this is the correct approach in a case of this nature. Again, as we have repeatedly noted, this is a § 1983 action initiated by the Libbras. As part of their prima facie case under § 1983, the Libbras must establish a Constitutional deprivation. Here, there is no Constitutional deprivation unless the speech at issue qualifies as protected speech. And, since not all speech is protected under the First Amendment, the Libbras cannot establish a prima facie case unless they show that

---

4. Although we informed the Libbras in our June 22 order that they were required to convince the Court that their speech was protected, they apparently ignored that order. Indeed, in their responses to Defendants' summary judgment motions, they proceeded as if all speech is protected under the First Amendment and the Defendants were required to come forward with evidence suggesting that the content of the signs was not protected. As will become more apparent in this opinion, the Libbras' failure to comprehend our order has resulted in disastrous consequences at the summary judgment stage of this proceeding.

their speech enjoys First Amendment protection. Finally, since statements made with actual malice do not enjoy First Amendment protection, the Libbras must show that their statements were made in the absence of actual malice.[5]

A case of this nature raises another interesting issue. In a § 1983 suit involving a public employee who alleged that she was retaliated against because she had exercised her Constitutionally protected right of free speech, the Supreme Court held that "the inquiry into the protected status of speech is one of law, not fact." *Connick v. Myers*, 461 U.S. 138, 148 n. 7, 103 S.Ct. 1684, 1690 n. 7, 75 L.Ed.2d 708 (1983). Thus, in the instant matter, it would appear clear that the Court is to determine whether the Libbras' signs qualify as protected speech. However, in order to determine whether the speech at issue qualifies as protected speech, we must consider whether the Libbras acted with actual malice. But, in defamation actions initiated by public officials, it is the jury that must determine whether the speaker acted with actual malice, not the court. *See Babb v. Minder*, 806 F.2d 749, 756 (7th Cir.1986) ("The evidence adduced at trial indicates that [defendant] acted with reckless disregard of the truth or falsity of the defamatory statements and thus supports the jury finding of actual malice."). Regardless, because we conclude in this opinion that the Libbras' conduct constitutes as actual malice as a matter of law (*i.e.*, no rational trier of fact could conclude otherwise), no further discussion concerning this particular dilemma is necessary.

Now, to the heart of the analysis.

■ As previously indicated, in order to determine if the content of the Libbras' signs rises to the level of protected speech, we defer, in large part, to "actual malice" jurisprudence. Actual malice is generally defined as statements made "with knowledge of their falsity or in reckless disregard of whether they are true or false." *Garrison v. Louisiana*, 379 U.S. 64, 78, 85 S.Ct. 209, 217, 13

L.Ed.2d 125 (1964); *accord, Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 688, 109 S.Ct. 2678, 2696, 105 L.Ed.2d 562 (1989). "Reckless disregard" in turn is loosely defined as requiring, at a minimum, that the speaker make the statements with a "high degree of awareness of their probable falsity," *Garrison*, 379 U.S. at 74, 85 S.Ct. at 216, or he must have "entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). However, in determining whether a statement was made with "actual malice" or, more particularly, with "reckless disregard," the Supreme Court has cautioned that these terms are not capable of being defined in "one infallible definition." *Harte–Hanks Communications, Inc.*, 491 U.S. at 686, 109 S.Ct. at 2695. "Rather, only through the course of case-by-case adjudication can we give content to these otherwise elusive constitutional standards." *Id.*

■ With this in mind, we will now analyze the signs at issue to determine if the statements contained therein were made with "actual malice," or more specifically, with "reckless disregard." Before beginning the analysis, however, we must take care of one last preliminary matter. We are mindful that statements of opinion receive full Constitutional protection under the First Amendment. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19–20, 110 S.Ct. 2695, 2706, 111 L.Ed.2d 1 (1990). However, since the statements contained within the signs at issue here reasonably imply that the Libbras had an underlying factual basis for making those statements, the statements do not qualify as mere opinions. *See id.* at 20, 110 S.Ct. at 2706; *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir.1993) ("[I]f it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, *rather than claiming to be in possession of objectively verifiable facts*, the statement is not actionable.") (emphasis ours).

5. At this point, the Court stresses that this action is obviously not a defamation case. Our reliance on and resort to defamation principles is helpful and provides some guidance in determining if the speech at issue is protected. But because of the unique nature of this case, those principles are not entirely controlling.

Since the Libbras are burdened with the task of convincing the Court that their signs are protected under the First Amendment, our analysis will be limited to only those signs discussed in the Libbras' summary judgment responses. We will not sift through the voluminous deposition testimony searching for signs not discussed in the pleadings, nor will we devise arguments for the Libbras. Such is their attorney's responsibility, not ours.

## A. "Has newspaper owner been accused of fondling boys? Ask him"

 The first sign stated: "Has newspaper owner been accused of fondling boys? Ask him." The Litchfield News Herald is owned by John Hanafin.[6] Although the entire Libbra family is named as plaintiffs in this action, only Joe Libbra accepted responsibility for creating this particular sign. Thus, since Vicki, Troy, and Todd Libbra did not take part in creating this sign, they cannot claim that it represents their speech.[7]

At the deposition of Joe Libbra, the following transpired regarding this particular sign:

Attorney: Do you have any information that Mr. Hanafin has been accused of fondling boys?

Joe: I don't know what Hanafin has to do with this.

Attorney: That's not my question. Let me ask you this. Do you have any information that Mr. Hanafin has been accused of fondling boys?

Joe: I don't know what he does. I don't have any information about John Hanafin. I don't know anything about John Hanafin except that he owns the paper.

Attorney: Would you agree that a statement like that, if it referred to John Hanafin, would be made without any information or basis by you?

Joe: If.

Attorney: If, would you agree with that statement?

Joe: If, John Hanafin's name was on there, I think he would be offended.

Attorney: Would you also agree that there was nothing to substantiate an accusation to accuse?

Joe: I don't know what John does.

Attorney: Would you agree that you have no such information?

Joe: I don't care what John does. I have no information.

Based on Joe's deposition testimony, this sign contained completely baseless accusations. Since Joe indisputably had no information regarding the truth or falsity of his accusation, this speech was made with reckless disregard for the truth and is thus not protected by the First Amendment.[8]

---

6. Incidentally, John Hanafin is not a named defendant in this matter. Nor, is he alleged to have been part of the civil conspiracy to retaliate against the Libbras. Furthermore, the Libbras have not provided any evidence or argument suggesting why the named Defendants would *retaliate* against them for posting signs critical of *other individuals*. Thus, we probably should not even analyze signs critical of individuals other than the named Defendants. However, because the signs are not protected by the First Amendment, we will nevertheless discuss them.

7. Both Vicki and Troy stated that they were not involved in creating the sign. Todd stated that he could not remember if he was involved in the creation of the sign. If Todd cannot remember if he was involved in the creation of this sign, surely he cannot claim that it represents his speech.

8. It should be noted that Vicki, Todd, and Troy claim that a young boy named Joey Page (also known as "Ricky") told Joe and Vicki that he was fondled by John Hanafin. However, Joe, who is the only plaintiff to assume responsibility for creating the sign, never mentioned anything about a young boy. According to Joe, he knew nothing about John Hanafin, other than the fact that Mr. Hanafin owned the local newspaper. This contradictory testimony is troubling. Especially considering the fact that Vicki testified that Joe was present when the young boy revealed this information. Yet, Joe never testified to this occurrence. But, nevertheless, because only Joe can claim that the sign represents his speech, and based on his testimony the sign contains baseless accusations, the testimony of the other Libbras is irrelevant.

Even if Joe would have testified that a young boy told him he was fondled, based on the seriousness of such an accusation, we seriously

## B. "Mr. True Value son gay"

 The second sign discussed in the Libbras' response apparently refers to the son of an individual named Ron Reeves. Mr. Reeves was the Libbras neighbor at the time and owned a True Value hardware store in Litchfield. No other individual in Litchfield owned a True Value hardware store. The sign stated: "Mr. True Value son gay." The pertinent deposition testimony reads as follows:

Attorney: Do you have any information that supports a statement that Ron Reeves' son was gay?

Joe: I have no idea what Ron Reeves' son does.

\* \* \* \* \* \*

Attorney: Do you have any evidence to support a sign that would indicate, that would substantiate an accusation that his son was gay?

Vicki: No, I don't have any evidence.

\* \* \* \* \* \*

Attorney: What evidence do you have that establishes that Mr. Reeves' son was gay?

Troy: I have no evidence that he was gay.

Once again, we have a sign posted by the Libbras and absolutely no evidence to support the allegations contained within that sign.[9] Clearly, this particular sign was also created with reckless disregard for the truth and is thus not protected by the First Amendment.[10]

## C. "Does city attorney still visit madam Debbie" and "Did city attorney get AIDS Debbie's whorehouse"

 The third sign at issue was directed at the Litchfield City Attorney, Paul McWilliams.[11] The sign stated: "Does city attorney still visit Springfield madam Debbie?" There was also another sign directed at Mr. McWilliams, which stated: "Did city attorney get AIDS Debbie's whorehouse." At depositions, the Libbras testified as follows regarding these signs:

Attorney: Do you have any information that would indicate that Paul McWilliams ever visited Debbie Troxel's whorehouse?

Joe: I don't remember.

Attorney: Do you have any information that Paul McWilliams suffered from AIDS?

Joe: I don't have any idea. I'm not a doctor.

\* \* \* \* \* \*

Attorney: Do you have any information that Paul McWilliams was visiting Debbie Troxel in Springfield?

Joe: Talk to Debbie. I don't know.

Attorney: You don't know?

Joe: Talk to Debbie.

\* \* \* \* \* \*

Attorney: What information is the basis for that particular statement to be published to the citizens of the City of Litchfield that City Attorney was visiting a madam by the name of Debbie?

doubt the statement of a young boy (age 10 or 11), without more, would justify the Libbras' conduct. Indeed, Vicki testified that she did not report the young boy's accusations to anyone, not even his parents. Furthermore, there was no attempt by the Libbras to verify or investigate the statement.

9. Todd cannot recall if he was involved in making this sign, thus, he cannot claim that it was his speech.

10. Even if the allegations were true, we question whether such speech receives First Amendment

protection. What social value is to be gained by attacking a private individual in this manner? See Swank v. Smart, 898 F.2d 1247, 1250–51 (7th Cir.1990) ("Such conversation is important to its participants but not to the advancement of knowledge, the transformation of taste, political change, cultural expression, and the other objectives, values, and consequences of the speech that is protected by the First Amendment.").

11. Paul McWilliams is now deceased.

Todd: I don't know exactly what was said or anything to anybody.

Attorney: You don't know of anything to support that, correct?

Todd: I don't.

Based on Joe and Todd's testimony, these signs also contain baseless accusations.[12] However, interestingly, during Troy's deposition, he claimed that Debbie told his father that Mr. McWilliams visited her. Once again, we are troubled by the inconsistent testimony among the Libbras. If Debbie did in fact provide such information to Joe, why do Joe, Todd, and Vicki fail to corroborate Troy's testimony? Because of this inconsistent testimony and the fact that Joe, Todd, and Vicki testified otherwise, the Libbras have not convinced the Court that the content of this sign rises to the level of protected speech.[13]

## D. "Ms. D.A. needs line coke"

■ The next sign at issue apparently refers to the State's Attorney, Katherine Dobrinic, a named defendant in this matter. The signs stated: "Ms. D.A. needs line coke." Joe claimed that someone told him that they saw Dobrinic use cocaine. However, Joe refused to identify this source. Troy also testified that someone told him that Dobrinic used cocaine, but he similarly refused to identify the source. Finally, Todd heard the same rumor and like his father and brother, he refused to identify the source of the rumor. Todd had additional information though, he also claimed that he saw Dobrinic with a "red nose" and she was "sniffling." [14]

The Libbras need more to convince this Court that they did not act with reckless disregard for the truth here. Indeed, the Libbras based serious allegations of criminal conduct against a State's Attorney by relying entirely upon unidentified sources. For all we know, this alleged source could be a pathological liar or, of course, the Libbras could be lying. Furthermore, there is no evidence that the Libbras tried to verify the accuracy of the information provided to them by the anonymous source.[15] If speech is considered protected merely because an individual alleges that someone provided him with the damaging information, yet he fails to identify that individual, the "reckless disregard" analysis would become a mockery. See St. Amant v. Thompson, 390 U.S. 727, 732, 88 S.Ct. 1323, 1326, 20 L.Ed.2d 262 (1968) ("Professions of good faith will be unlikely to prove persuasive, for example, where a story is ... based wholly on an unverified anonymous telephone call.");

12. Vicki testified that she was not involved in the creation of this sign, regardless, she also testified that she was not aware of any information that Paul McWilliams visited a house of prostitution.

13. Even assuming Joe would have testified that Debbie informed him that Mr. McWilliams visited her, we would still find that the sign was made with reckless disregard for the truth. Joe testified that he met Debbie only once. Joe also testified that he read in the newspaper that Debbie was accused of operating a house of prostitution. Surely, a source of this nature—an individual met on only one occasion and an operator of an illegal business—is of low character and inherently incredible. Basing such damaging allegations on the information supplied by a person of Debbie's character, without more, will not suffice to convince this Court that such speech is protected. See Babb v. Minder, 806 F.2d 749, 755–56 (7th Cir.1986) (" '[R]eckless conduct may be evidenced in part by failure to investigate thoroughly and verify the facts ... particularly where the material is peculiarly harmful or damaging to [an individual's] reputation or good name,' [citations omitted] ... especially 'where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.' ");

Price v. Viking Penguin, Inc., 881 F.2d 1426, 1445 (8th Cir.1989) (Reckless disregard can be shown if "there were particular reasons to doubt sources.").

14. We are not aware of any testimony from Vicki regarding this sign.

15. Throughout this opinion, we are mindful that the Supreme Court has stated that a failure to investigate, by itself, is not enough to establish actual malice. Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); accord, Babb v. Minder, 806 F.2d 749, 755 (7th Cir.1986). However, the Supreme Court has also stated that actual malice is present where one fails to investigate and there were obvious reasons to doubt the veracity of the informant. St. Amant v. Thompson, 390 U.S. 727, 732, 88 S.Ct. 1323, 1326, 20 L.Ed.2d 262 (1968); accord, Babb, 806 F.2d at 756. As already discussed in this opinion, see footnote 6, the instances where the Libbras "attempt" to rely on an informant involve highly suspect informants or obvious reasons to doubt the veracity of that informant.

*Woods v. Evansville Press Co., Inc.*, 791 F.2d 480, 485 (7th Cir.1986) ("Recklessness may be found, for example, . . . where a story is based entirely on an unverified anonymous telephone call."); *Price v. Viking Penguin Inc.*, 881 F.2d 1426, 1445 (8th Cir.1989) ("[R]eckless disregard in a story" can be found "if the sources were entirely anonymous and their reports unverified. . . ."). As for Todd's testimony regarding a "red nose" and "sniffling," we find this amusing. If this were enough to pass muster under the "reckless disregard" analysis, any person suffering from a common cold would be at risk of being the subject of allegations pertaining to cocaine use. Accordingly, the content of this particular sign does not qualify as protected speech under the First Amendment.

### E. "Rumor has it Ms. D.A. is a dyke"

▮ The next sign at issue also referred to State's Attorney Dobrinic. This sign read: "Rumor has it Ms. D.A. is a dyke." At depositions, the Libbras testified as follows:

Attorney: My next question is do you have any information to lead you to believe that Katherine Dobrinic was a lesbian?

Joe: I don't know.

Attorney: You don't know?

Joe: I don't know.

\* \* \* \* \* \*

Attorney: Do you have any evidence that supports the fact that Ms. Dobrinic was a dyke?

Vicki: No.

\* \* \* \* \* \*

Attorney: [M]y question is, what evidence did you have that supports such a statement that Katherine

Dobrinic is a dyke? Are you aware of any?

Troy: I don't personally have any, no.

As evidenced by the Libbras' deposition testimony, the speech here was also made with reckless disregard for the truth.[16] Once again, we have a sign of a highly personal nature posted in the Libbras' frontyard, yet, they have absolutely no evidence to support the statements contained within that sign.

### F. "Ms. Mayor and superintendent having an affair"

▮ The final sign referred to the Mayor of Litchfield, Dorothy Mansholt, a defendant in this action.[17] This sign read: "Ms. Mayor and superintendent having an affair." The pertinent deposition testimony is as follows:

Attorney: Are you aware of any information that Mayor Mansholt was having an affair?

Joe: I have no idea.

\* \* \* \* \* \*

Attorney: Was there any truth as far as you know to that sign?

Joe: No.

\* \* \* \* \* \*

Attorney: Was there any truth to the statement that Mayor Mansholt was having an affair on June 29, 1991?

Joe: I don't know if she was or she wasn't.

\* \* \* \* \* \*

Attorney: Certainly, you don't have any evidence that they were having an affair, do you?

Troy: I don't.

And this is one more sign based on completely unfounded allegations.[18] Obviously,

---

16. Todd refused to answer any questions pertaining to this particular sign. Since he refused, Todd has obviously not come forward with any evidence suggesting that this sign was made without reckless disregard for the truth.

17. In the Libbras' supplement to their original response, they discuss an additional sign, which stated "The CROOKS, Mansholts, Kirby/Reeves, D.A./Vazzi." However, the only deposition testimony we could locate regarding this particular

sign was from Troy. In response to a question asking what basis the Libbras had for calling the named individuals "crooks," Troy replied "I don't know." Troy Dep. pg. 56. Based on the deposition testimony of Troy, the Libbras have not convinced us that this sign should receive Constitutional protection.

18. Vicki Libbra stated that she was not involved in creating this particular sign. She also stated though that she was not aware of any evidence

this sign was made with reckless disregard for the truth and receives no protection under the First Amendment either.

In summary, the Libbras' deposition testimony supports the conclusion that almost all the signs were made without any underlying factual basis whatsoever. It appears the Libbras concocted or fabricated the allegations contained within those signs. Clearly, the content of such signs is not protected under the First Amendment. *See Brenner v. Brown*, 36 F.3d 18, 20 (7th Cir.1994) ("[S]peech is not protected where it is[ ] made with reckless disregard for the truth, or is otherwise profane and disparaging."); *Fong v. Purdue University*, 692 F.Supp. 930, 956 (N.D.Ind.1988). **Indeed, under the substantive law of Illinois, the Libbras could find themselves civilly liable for defamation.**

Regarding some of the other signs, the Court is confronted with inconsistent testimony, information from highly suspect and inherently incredible or questionable sources, and a source the entire Libbra family refused to identify. Considering these visible weaknesses in the Libbras' case, in conjunction with the number of indisputably baseless allegations contained within most of the other signs, they have not convinced the Court that these signs were made with anything but reckless disregard for the truth.

## IV

Because we concluded that the content of the signs does not qualify as protected speech under the First Amendment, our analysis of this matter could end right here. However, because we express our doubts as to whether the Libbras were in fact retaliated against by the named Defendants, we will also address that issue. As previously noted, the Libbras identify four events in support of their claim that they were retaliated against or harassed by the named Defendants: (1) their signs were set ablaze; (2) they were "illegally" evicted from their home; (3) the Litchfield Police Department parked their automobiles in front of their residence and photographed the signs; and (4) the Litchfield Police Department issued four tickets to Joe for violating a residential zoning ordinance. We will discuss each event in turn.

■ First, on December 12, 1990, some of the Libbras' signs were set on fire. The signs at issue apparently referred to Mayor Mansholt and individuals by the names of Bob Weatherford and Bob Hermsmeyer. The cause of the fire has yet to be determined. The Libbras have no evidence, other than mere speculation, that Mayor Mansholt (or for that matter, any other named Defendant in this action), was involved in the fire.

The night prior to the fire, an individual named Brad Frerichs came to the Libbra residence and asked Troy if he would remove the signs.[19] Mr. Frerichs allegedly threatened Troy to take the signs down by morning or "we will take them down."

Although they have no evidence, the Libbras believe that Frerichs, Weatherford, and Hermsmeyer were involved in the fire. Even assuming the Libbras belief is correct, they have not come forward with any evidence linking Defendant Mayor Mansholt or any other named Defendant to this incident. Furthermore, they have not alleged that Frerichs, Weatherford, or Hermsmeyer were part of the conspiracy to harass or retaliate against them.

There is an even more fundamental reason the fire cannot qualify as an act of retaliation or harassment. In order to so qualify, the Libbras must—at a minimum—come forward with a sign that qualifies as protected speech prior to the fire.[20] This the Libbras have failed to do. We do not know what signs were set afire. Furthermore, the Libbras have not presented any evidence as to why the signs predating the fire qualify as pro-

---

that the Mayor and superintendent were having an affair. We could not locate any deposition testimony form Todd pertaining to this sign.

**19.** In Joe's deposition, Brad Frerichs is referred to as Brad "Farris."

**20.** The signs specifically discussed in this order were not posted until June of 1991. The Libbras have not discussed a sign prior to this time.

tected speech.[21] Accordingly, the incident involving the fire cannot qualify as an act of harassment or retaliation with respect to the named Defendants.

The second event of alleged harassment and/or retaliation involves the alleged "illegal" eviction of the Libbras from their residence. As discussed in the "Background" portion of this opinion, the Libbras rented their home from the Joudahs. The Joudahs failed to maintain their monthly mortgage payments and in the latter part of 1990, America's Mortgage Company instituted foreclosure proceedings. Judge Coady of the Montgomery County Circuit Court entered an order allowing the judgment against the Joudahs and authorizing the sale of the Libbra residence. Judge Coady subsequently entered an order confirming the sale of the residence. Although the Libbras were never made a party to the foreclosure proceeding, they were given notice on two occasions that their residence was sold and they would have to vacate the property.

Because the Libbras failed to vacate, America's Mortgage Company hired a moving company to remove the Libbras' possessions from the premises on June 18, 1991. An emergency hearing was held before Judge Coady. Judge Coady set a hearing date to determine the Libbras' right to possess the property. On June 27, 1991, Judge Coady determined that the Libbras had no right to possess the property and ordered them to vacate the property by July 18, 1991.

The Libbras argue that the eviction was "illegal" and the Defendants were involved.[22]

For purposes of this opinion, we will assume that the eviction on June 18 was improper because the Libbras were never made a party to the foreclosure proceeding against the Joudahs. Regardless, however, we fail to see how any of the named Defendants were involved in initiating the eviction process.

With respect to Defendants Mayor Mansholt, Chief of Police William Dolahite, and the City of Litchfield, the Libbras have no evidence linking them to any involvement in the eviction process other than mere speculation. Joe testified that Mayor Mansholt and Chief Dolahite were involved because he "knew they wanted him out." Joe testified that others told him they wanted him out, but once again, Joe could not identify one person who informed him of this. Vicki could similarly not point to any evidence linking Mayor Mansholt or Chief Dolahite to the "improper" eviction. Indeed, Vicki testified that the *"sole "* reason she believes Mayor Mansholt and Chief Dolahite were involved in the eviction was because the Libbras posted signs critical of them.

The Libbras have no evidence linking Defendant State's Attorney Katherine Dobrinic to the improper eviction either. The Libbras argue that Dobrinic was involved because she ordered Sheriff James Vazzi to take part in the eviction process. The deposition testimony established that America's Mortgage Company contacted Dobrinic and Vazzi prior to the eviction because they were concerned that violence could erupt. In order to avoid trouble, America's Mortgage Company requested the presence of a police officer. After reading the order from Judge Coady,

---

**21.** As we discussed in footnote 3, in our order of June 22, we informed the Libbras that they had the burden of coming forward with evidence establishing that the signs qualified as protected speech. Apparently they have ignored that order. They have failed to discuss any signs that were posted prior to the fire, and obviously they have not discussed why the content of those signs should be protected under the First Amendment.

**22.** As a result of the foreclosure proceedings, the Libbras also brought a procedural due process claim. However, because the Libbras received an emergency hearing and another hearing on June 27, 1991 to determine if they had a right to possess the property, they were afforded due process of the law and we therefore readily disposed of that claim on summary judgment in our

order of June 15, 1995. *See Zinermon v. Burch,* 494 U.S. 113, 125–29, 110 S.Ct. 975, 983–85, 108 L.Ed.2d 100 (1990) ("The constitutional violation actionable under § 1983 is not complete unless and until the State fails to provide due process."); *Small v. Young,* Nos. 88–2125; 88–2312; 88–2781; 88–3289, 907 F.2d 152, LEXIS 9869, *20 (7th Cir. June 18, 1990) ("The cure for a violation of procedural due process is additional proper procedure."); *McKinney v. Pate,* 20 F.3d 1550, 1557 (11th Cir.1994) ("[T]he state may cure a procedural deprivation by providing a later procedural remedy; only when the state refuses to provide a process sufficient to remedy the procedural deprivation does a constitutional violation actionable under § 1983 arise.").

Dobrinic concluded that the order was valid and directed Vazzi to "keep the peace" during the eviction process.[23] The act of placing police officers at an eviction is not uncommon.

Assuming the eviction was improper, if the Libbras have anyone to blame, it is America's Mortgage Company for not making them a party to the foreclosure action. America's Mortgage Company initiated the eviction process and hired a moving company to remove the Libbras' possessions. There is simply no evidence linking Dobrinic or any other named defendant to the initiation of the eviction proceeding. America's Mortgage Company had a facially valid court order authorizing them to take possession of the property after March 16, 1991, and they hired a moving company to remove the Libbras' possessions on June 18, 1991.

In sum, the Libbras have not convinced us that the Defendants played an improper role in the initiation of the eviction process. Simply stated, America's Mortgage Company—not Defendants—was responsible for the "improper" eviction.[24] Furthermore, identical to the sign burning incident, the Libbras have also failed to identify a sign that qualifies as protected speech prior to the attempted eviction on June 18, 1991.[25] As discussed above, without a sign that qualifies as protected speech, the Libbras cannot claim that they were retaliated against for exercising their First Amendment right to free speech. Accordingly, this incident cannot be used to support a retaliation claim.

■ The third event of retaliatory conduct identified by the Libbras is the act of the Litchfield Police Department parking their automobiles in front of the Libbra residence for the purpose of photographing the signs and maintaining a record log of the content of the signs. It appears the police officers engaged in this activity on a daily basis, sometimes two or three times a day, from fifteen to thirty minutes at a time. There is no evidence that the police officers involved were ever directed to the Libbra residence for a purpose other than photographing the signs.

Assuming the Defendants directed the police offices to photograph the signs, we are reluctant to conclude that such conduct could constitute as retaliatory. The Libbras must show, by a preponderance of the evidence, that the substantial or motivating factor for the defendants' conduct was retaliation. *Rakovich v. Wade*, 850 F.2d 1180, 1189 (7th Cir.1988); *Bennett v. Village of Oak Park*, 748 F.Supp. 1329, 1333 (N.D.Ill.1990). There is no evidence that the police officers were there to try to intimidate the Libbras or engage in any other form of improper conduct. Based on the Libbras' testimony, the police officers were present for short periods of time to photograph the signs. They always remained on public property. They performed no other acts other than photographing the signs and recording the content of those signs. Since the Libbras' signs contained such highly inflammatory accusations about public and private citizens and there were many complaints concerning those signs, the photographing could have been legitimately ordered for investigative purposes, *i.e.*, to determine what, if any, action the City of Litchfield could take against the Libbras.

Although, the possibility exists that the police officers were in fact directed to photograph the signs for purposes of harassing the Libbras, as with the other acts of alleged retaliatory conduct, the Libbras fail to identify or discuss a sign that qualifies as protected speech prior to the police officers' conduct

---

23. As discussed above, Judge Coady issued an order granting the judgment for foreclosure in favor of America's Mortgage Company and authorizing the sale of the property. In February of 1991, Judge Coady also issued an order confirming the sale of the property. This order directed the Sheriff to obtain possession of the property by March 16, 1991.

24. Incidentally, America's Mortgage Company is not a defendant in this action and the complaint does not allege that they were a part of the civil conspiracy against the Libbras.

25. Apparently, all the signs we have discussed in this order were posted *after* the attempted eviction on June 18.

at issue.[26]

 The final act of retaliation involves the issuance of four tickets to Joe Libbra. One ticket per day was issued on June 20, 21, 22, and 23, 1991. The tickets charged Joe with violating the City of Litchfield's residential zoning ordinance. After a cursory review of the zoning ordinance, it appears the tickets were improperly issued. Indeed, the ordinance has nothing to do with the content of a particular sign. Moreover, none of the Defendants offer an argument as to the propriety of issuing the tickets. Thus, it appears that they are conceding that the tickets were issued for an improper purpose.

However, it does not appear that any of the Defendants were involved in the decision to issue the tickets to Joe. All the deposition testimony indicated that Paul McWilliams, the Litchfield City Attorney, was solely responsible for that decision. The Libbras have not come forward with any evidence linking one of the named Defendants to McWilliams' decision, other than mere speculation. Furthermore, McWilliams is not a named defendant in this matter, nor is he alleged to be a part of the conspiracy against the Libbras. Accordingly, this act cannot constitute as retaliatory.

In summary, with the possible exception of the sign photographing by the Litchfield Police Department, the Libbras cannot link any of the Defendants to any of the alleged retaliatory acts. They simply have no evidence other than their mere speculation. And, as discussed above, even if the Libbras could link Defendants to the sign photographing, the possibility exists that the Libbras could not show, by a preponderance of the evidence, that the motivating factor for this action was retaliatory, as opposed to legitimate investigatory reasons.

### CONCLUSION

In conclusion, because the Libbras have failed to show that any of the signs were protected under the First Amendment, they have failed to establish a Constitutional deprivation and their § 1983 claim must fail.

Indeed, the Libbras' testimony established that the accusations contained within their signs were completely baseless and unfounded, apparently fabricated by the Libbras.

The Court is very disturbed by the Libbras' conduct. They posted signs attacking both public and private individuals. The attacks on those individuals concerned matters of a highly personal, immoral, and even criminal nature.

 As repeatedly noted by the Supreme Court, the First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States,* 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498 (1957).

What potential social value was to be gained by the posting of such signs? The Libbras' callous and reckless disregard for the truth is disturbing to say the least. Even more disturbing is their attempt to justify their outrageous conduct and actions by seeking the protection of our Constitution.

The Libbra family should be ashamed of itself and held accountable for its atrocious and reprehensible conduct.

**CASE CLOSED.**

---

**26.** Once again, the signs specifically discussed in this order were apparently posted after the pho-

tographing of other signs.