**Kathleen KELLEHER,
Plaintiff-Appellant,**

v.

**Peter FLAWN, Gerhard Fonken, Robert King, Joseph Horn, and Charles Cnudde, Defendants-Appellees.**

**No. 83–1871.**

United States Court of Appeals, Fifth Circuit.

June 3, 1985.

Sarah Scott, Brooklyn, N.Y., James Simons, Austin, Tex., for plaintiff-appellant.

Jim Mattox, Atty. Gen., Scott McCown, Asst. Atty. Gen., Austin, Tex., for defendants-appellees.

Suzan T. Cardwell, Houston, Tex., for Peter T. Flawn.

Before WISDOM, WILLIAMS, and HILL, Circuit Judges.

ROBERT MADDEN HILL, Circuit Judge:

Under 42 U.S.C. § 1983, Kathleen Kelleher, a graduate student and assistant instructor in the Government Department of the University of Texas at Austin, brought this action against various officials of the University. She claims she was denied rights guaranteed her under the First and Fourteenth Amendments of the Constitution when she was reassigned from a teaching position to a position in which she was not primarily responsible for the teaching of a course. We affirm the district court's judgment in favor of all defendants.

I.

Kelleher held the position of assistant instructor (AI) in the Government Department of the University of Texas (the University) during the 1979–80 term. At the University, an AI is a graduate student in the last phase of a Ph.D. program. The position is not tenured nor is it considered a stage in the advancement towards tenure. AI's are heavily supervised by the faculty. The University's "Handbook of Operating Procedures," § 8.03(2), provides that "instructional service [rendered by AI's] is to be rendered in accordance with a syllabus and/or other specific guidelines and criteria which have been prepared and approved by the departmental faculty."

In the summer of 1980 two students complained of the method and content of Kelleher's teaching of American Government 312. She was scheduled to teach Government 310, the introductory course in the 310–312 sequence, in the fall of 1980. At this time, mid-August 1980, the Department of Government was awaiting the arrival of a new department chairman, Charles Cnudde. Cnudde was brought to the University as part of an ongoing attempt to restructure the department's teaching of the 310–312 course sequence to comply with the legislative mandate in that regard. The outgoing chairman was Karl Schmitt and the acting chairman was Robert Hardgrave.

The complaints came to the attention of Dean Joseph Horn, Associate Dean of the College of Liberal Arts. In a letter, Dean Horn requested Hardgrave to investigate the complaints. Copies of Dean Horn's letter were sent to Gerhard Fonken, the Vice President for Academic Affairs, and Robert King, the Dean of the College of Liberal Arts. The President of the University, Peter Flawn, was also notified of the complaints and the investigation. Hard-

grave, in response to Dean Horn's inquiry, wrote a convincing 3-page letter that concluded that all complaints against Kelleher were "without substance."

At Fonken's insistence, Dean Horn continued to investigate the complaints against Kelleher. As a peripheral result of this investigation, Dean Horn concluded that the department's use of AI's was not in compliance with § 8.03 of the Handbook. President Flawn had meanwhile instructed that Kelleher's reappointment to the AI position be held pending the outcome of the investigation and that if the investigation revealed a "sufficient basis" Kelleher would "be removed from the classroom."

AI's are generally appointed to their positions by "memoranda of appointment" which issue from the dean's office of the particular department in which the AI is enrolled. The memoranda are subject to the final approval of the Vice President of Academic Affairs after intermediate approval by the College Dean. The Government Department memoranda for the fall of 1980 had been dispatched to the Office of the Dean of the Liberal Arts College where Dean Horn reviewed them. The memoranda were subsequently returned to the Government Department by Dean Horn for failure to comply with § 8.03: the memoranda permitted the AI's to prepare their own course syllabi rather than requiring that they be prepared by full faculty members or pursuant to specific guidelines prepared by the faculty.

Thus, when Cnudde, the new Chairman of the Government Department, began his term on August 12, he was confronted with three problems: (1) the adequacy of the 310–312 classes with respect to content and form; (2) the extent of compliance with § 8.03 in using AI's; and (3) the Kelleher controversy.

On August 21 Cnudde met with Kelleher to discuss the complaints. Their versions of the meeting diverge sharply, Kelleher characterizing it as amicable and calm, Cnudde characterizing it as a confrontation pitting her belligerence against his attempts at reassurance and conciliation.

Both, however, agree that Cnudde first reassured Kelleher that she remained in good standing in the department. They also agree that they discussed: (1) the fact that the cancellation of the August memoranda of appointment had no connection with the controversy surrounding her; and (2) Kelleher's own syllabus, specifically, her failure to use a Texas government text and readings in Texas politics, which Cnudde considered requisite. At this point Kelleher stated, "I am not sure I want to teach the course if [I have to use a textbook in Texas politics]." Kelleher claims she explained her unwillingness to use a Texas text by saying she did not believe the relevant legislation mandated it. Cnudde denies that Kelleher offered this explanation and claims Kelleher went on to object to any review of her syllabus and called the meeting an "inquisition."

Kelleher claims the meeting ended cordially. Cnudde claims that Kelleher was shouting and cursing at him by the end of the meeting and that he told her firmly that she would not teach Government 310 in the fall, his reasoning being that her actions indicated an unwillingness to comply with his authority and that of the regulations.

In any event, it is conceded that Cnudde had decided to reassign Kelleher by the close of the meeting. Cnudde testified at trial that his decision to change Kelleher's duties was not influenced by the complaints concerning the summer class or by an earlier letter from Dean Horn to Vice President Fonken expressing the opinion that Kelleher had "clearly exceeded her authority" in her conduct of the summer course. Cnudde also claims he knew nothing of the correspondence between President Flawn and Fonken concerning Kelleher's reappointment. In fact, Cnudde believed that Hardgrave's letter had completely exonerated Kelleher of any wrongdoing in connection with her teaching practices. He also testified that he shares with Kelleher a common political perspective. Flawn, Fonken, King, and Horn all claim they had

no influence on Cnudde's reassignment of Kelleher.

On August 25 Kelleher was definitely told that she would not be teaching Government 310 in the fall. On August 27 she received a memorandum of appointment as an AI but without teaching responsibility; she would be permitted "to assist a faculty member … by grading [and] leading discussion sections." On September 10 Kelleher accepted the reassignment "under duress." On September 19 she withdrew her acceptance. On December 1 she initiated a formal grievance proceeding, contesting the propriety of what she termed a "demotion."

The Grievance Committee that considered her complaints did not find a First Amendment violation but ruled that Kelleher was denied due process and recommended that she be paid for the fall 1980 semester. When the Committee's recommendations were sent to the President's office, Flawn rejected the due process finding because he believed graduate students not to be entitled to a hearing contesting their assignments. Flawn stated, however, that Kelleher had been inadequately supervised by the department and that no blame attached to her conduct.

Kelleher then filed this civil rights action against Flawn, Fonken, King, Horn, and Cnudde. After a bench trial, the district court dismissed Kelleher's suit without written findings. The court, however, stated on the record that it found no First Amendment violation because Kelleher was "put … to a constitutional choice" when she was reassigned, her decision to reject reassignment being "a failure to mitigate damages." The court also found that the reassignment was not a "constructive termination." Finally, the court found no due process violation.

II.

■ Kelleher claims her First Amendment rights were violated in that she was reassigned in retaliation for expressing political opinions in her Government course. To prove a retaliation claim cognizable under the First Amendment, the plaintiff must show that her speech was constitutionally protected and that it was a "substantial" or "motivating" factor in the defendant's decision. *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). If this burden is discharged, the burden of proof then shifts to the defendant to show that the same decision would have been made even in the absence of the protected speech. *Id.* The district court apparently[1] held that Kelleher's exercise of protected First Amendment rights was not a motivating factor in the decision to reassign her. We are thus called upon to decide what aspects of Kelleher's speech or conduct, if any, were protected and whether any such protected activity motivated Cnudde's reassignment of Kelleher.

For the sake of argument, the defendants concede that all of Kelleher's activities before August of 1980, including her conduct of the Government 310 course and her criticism of the Government Department's 310–312 guidelines, were protected by the First Amendment. We assume the same without expressing an opinion on that question. The University officials assert, however, that Cnudde reassigned Kelleher, not because of any expressions during the early summer of 1980, and not because of her criticism of the department, but because of her conduct in the August 21 meeting at which she demonstrated a tendency to insubordination and belligerence in her resistance to Cnudde's attempts to impose guidelines on her teaching methods and on the content of her course.

1. While the district court's oral findings could have been more precise, their form was not objected to below or on appeal. Thus, we are constrained to construe them "liberally" and to find them "in consonance with the judgment, so long as that judgment is supported by evidence in the record." *Gilbert v. Sterrett*, 509 F.2d 1389, 1393 (5th Cir.), *cert. denied*, 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288 (1975).

■ Whether speech is entitled to First Amendment protection is a question of law. *Wheeler v. Mental Health & Mental Retardation Authority*, 752 F.2d 1063, 1069 (5th Cir.1985). The University officials' legal theory is sound. While a teacher does not surrender constitutionally protected rights of freedom of expression as a condition of public employment, *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968), that freedom is not absolute or unlimited. It is firmly established that the First Amendment's shield does not extend to speech and conduct amounting to insubordination directed at school officials. *Hillis v. Stephen F. Austin University*, 665 F.2d 547, 550–51 (5th Cir.), *cert. denied*, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982) (expressions of "plain insubordination" and "lack of cooperation" not protected); *Chitwood v. Feaster*, 468 F.2d 359, 361 (4th Cir.1972) (college has a right to expect cooperation from teacher in relation to head of the department.); *Hetrick v. Martin*, 480 F.2d 705, 709 (6th Cir.), *cert. denied*, 414 U.S. 1075, 94 S.Ct. 592, 38 L.Ed.2d 482 (1973) (university free, under First Amendment, to refuse to rehire a nontenured teacher whose teaching methods are incompatible with the teaching aims of the university); *Clark v. Holmes*, 474 F.2d 928, 931 (7th Cir.1972), *cert. denied*, 411 U.S. 972, 93 S.Ct. 2148, 36 L.Ed.2d 695 (1973) (state's interest in providing education in an orderly and efficient manner overrides teacher's First Amendment right to determine content of required course; speech expressing refusal to comply with university guidelines not protected); *Ahern v. Board of Education of School District of Grand Island*, 456 F.2d 399, 403–04 (8th Cir.1972) (teacher had no right to ignore valid dictates of school board regarding teaching methods and course content); *Palmer v. Board of Education of City of Chicago*, 603 F.2d 1271, 1272–74 (7th Cir.1979), *cert. denied*, 444 U.S. 1026, 100 S.Ct. 689, 62 L.Ed.2d 659 (1980) (public school teacher is not free to disregard, for First Amendment reasons, the prescribed curriculum concerning patri-

otic matters). As the Fourth Circuit wrote in *Chitwood v. Feaster:*

> A college has a right to expect a teacher to follow instructions and to work cooperatively and harmoniously with the head of the department. If one cannot or does not, if one undertakes to seize the authority and prerogatives of the department head, [she] does not immunize [herself] against loss of [her] position because [her] noncooperation and aggressive conduct are verbalized.

468 F.2d at 361. In less specific terms, the Supreme Court has drawn the distinction on which we rely:

> Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate constitutional values. On the other hand ... the First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom."

*Epperson v. Arkansas*, 393 U.S. 97, 104–05, 89 S.Ct. 266, 270–71, 21 L.Ed.2d 228 (1968) (quoting *Keyishian v. Board of Regents*, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967)).

■ It remains only for us to determine whether the officials' factual theory is supported in the record. Whether or not a plaintiff was discharged because of protected speech is a question of fact. *Wheeler v. Mental Health & Mental Retardation Authority*, 752 F.2d 1063, 1069 (5th Cir.1985) (citing *Schneider v. City of Atlanta*, 628 F.2d 915, 918–20 (5th Cir.1980)). Consequently, the district court's determination of that question, as fact finder, is to be reviewed under the clearly erroneous standard of Fed.R.Civ.P. 52(a), which was recently discussed in *Anderson v. Bessemer City*, — U.S. —, —, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985) ("If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse....").

■ The evidence presented the district court, as fact finder, with a stark credibility choice: whether to believe Kelleher's

version of the August 21 meeting or Cnudde's version. Kelleher's testimony, characterizing the meeting as cordial and conciliatory, if believed, excludes the possibility that Cnudde could have reassigned her for reasons of insubordination. Cnudde's version, on the other hand, if believed, presents a strong factual basis to support his conclusion that Kelleher would not cooperate with him or comply with his instructions or those of the department. Further, Kelleher concedes that at the meeting she expressed a reluctance to teach the course at all, if required to use a textbook in Texas politics.[2]

Cnudde testified that the events preceding his meeting with Kelleher had no bearing on his decision, that he was sympathetic with her views and that he considered that Hardgrave's letter completely absolved her of any charges of improper behavior in her teaching methods or in the content of her course. Cnudde testified that it was, rather, Kelleher's attitude of uncooperation and insubordination, expressed at the August 21 meeting, and that alone, that motivated his decision. It is clear that the district court credited Cnudde's explanation of his motives and his version of the meeting and not Kelleher's version of the events. "Findings as to the design, motive and intent with which [people] act depend peculiarly upon the credit given to the witnesses by those who see and hear them." *United States v. Yellow Cab Co.,* 338 U.S. 338, 341, 70 S.Ct. 177, 179, 94 L.Ed. 150 (1949). While there is record evidence supporting Kelleher's version, Cnudde's version provides a plausible account of the record testimony and we are unable to say that relying on it was clearly erroneous. *Anderson v. Bessemer City,* — U.S. at —, 105 S.Ct. at 1512. Finally, since Cnudde's decision was the only possible connection between Kelleher's deprivation and the actions of the other defendant officials, dismissal of the action as to Cnudde necessitated dismissal as to the remaining defendants.

■ We note that our holding expresses no opinion concerning the constitutional protection afforded Kelleher's in-class activities;[3] we merely hold that those activities did not motivate the change in Kelleher's position. Thus, the University officials' actions were not an attempt to "cast a pall of orthodoxy over the classroom." *Epperson v. Arkansas,* 393 U.S. at 105, 89 S.Ct. at 270. Nor was the content of Kelleher's private or public criticism of the department's guidelines in issue. *Cf. Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979) (criticism of school policies, whether expressed in public or private, may be protected). It was not the content of those particular comments but the spirit of insubordination revealed in her conduct and other statements at the August 21 meeting that determined Kelleher's fate. *See supra* note 2. Nor, finally, has Kelleher challenged the State's authority to mandate the use of certain textbooks in Texas politics. *Cf. Loewen v. Turnipseed,* 488 F.Supp. 1138 (N.D.Miss.1980) (upholding First Amendment challenges to state's authority to appoint committees empow-

---

**2.** It is irrelevant that after the meeting Kelleher expressed a change of heart on the Texas textbook use requirement since she concedes that Cnudde had made his decision by the end of the meeting and she does not assert that he had a constitutional obligation to restore her to her prior position when she later merely intimated a willingness to use the mandated textbook. *Cf. Hillis v. Stephen F. Austin State Univ.,* 665 F.2d at 549 (conduct occurring after alleged deprivation was irrelevant). Moreover, Kelleher's comments with respect to the textbook problem were less important for their content than for their manner of expression; to the extent her comments and behavior revealed to Cnudde a resistance to cooperation and a tendency to in-

subordination, her later retraction had no bearing on the true reason for Cnudde's decision.

**3.** *Cf. James v. Board of Education,* 461 F.2d 566 (2nd Cir.) (teacher's wearing of black arm-band in protest protectible where had no influence on students), *cert. denied,* 409 U.S. 1042, 93 S.Ct. 529, 34 L.Ed.2d 491 (1972); *Dean v. Timpson Indep. Sch. Dist.,* 486 F.Supp. 302, 307 (E.D.Tex. 1979) (teacher's use of sexually explicit survey in class was protected if not substantially disruptive); *Parducci v. Rutland,* 316 F.Supp. 352 (M.D.Ala.1970) (teacher's use of controversial short story in class was protected).

ered to select textbooks for use in local public schools without providing opportunity to object to selections). We therefore affirm the judgment in favor of all defendants on the First Amendment claim.

### III.

■ Kelleher claims that her reassignment without a prior hearing amounted to a violation of procedural due process. "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Board of Regents v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). Thus, in order to recover under the Fourteenth Amendment in a § 1983 action, a plaintiff must demonstrate that she was deprived of a liberty or property interest and that she was not afforded adequate procedural protection prior to or following the deprivation. *Id.*

#### A. Property Interest

A "person's interest in a benefit is a 'property' interest for due process purposes if there are ... rules or mutually explicit understandings that support [her] claim of entitlement to the benefit." *Perry v. Sinderman,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972). "Property interests, of course, are not created by the Constitution." *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. Rather, "the sufficiency of the claim of entitlement must be decided by reference to state law." *Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976). Kelleher asks us to find that the law of Texas gave her a claim of entitlement to the benefits of her position as a graduate student instructor.

We need not, however, determine whether Kelleher had a property interest in her AI position as an entirety. We begin with the undisputed fact that Kelleher was reappointed to that position, albeit with different duties. Thus, even if Kelleher had a property interest in that position, we cannot say she was deprived of that interest. *Roth,* 408 U.S. at 569, 92 S.Ct. at 2705. To

be sure, Kelleher argues that the reappointment with reduced duties was tantamount to constructive discharge and that, therefore, she was deprived of her interest in the AI position as an entirety. However, the district court found that the reassignment did not constitute a constructive discharge and we agree.

■ An employer's activities may be deemed to amount to a constructive discharge only if "the employer made conditions so intolerable that the employee *reasonably* felt compelled to resign." *Shawgo v. Spradlin,* 701 F.2d 470, 481 (5th Cir.) (emphasis added), *cert. denied sub. nom., Whisenhunt v. Spradlin,* —— U.S. ——, 104 S.Ct. 404, 78 L.Ed.2d 345 (1983). The effect on the employee of the conditions imposed, not the employer's intentions, governs the outcome. *Id.* at 481 n. 12 (citing *Bourque v. Powell Electrical Manufacturing Co.,* 617 F.2d 61, 65 (5th Cir. 1980)). It is unclear whether the question is one of fact or a mixed question of fact and law. *Shawgo,* 701 F.2d at 482 n. 14 (citing *Junior v. Texaco,* 688 F.2d 377, 379–80 (5th Cir.1982)). However, under either standard of review we could find no reversible error in the district court's finding.

■ All AI's in the Government Department were reassigned, at a time subsequent to Kelleher's reassignment, from lecture to nonlecture duties for the fall of 1980. None resigned except Kelleher. Kelleher herself first accepted the reassignment but later changed her mind. The only change in her duties was withdrawal of the opportunity to teach Government 310–312. This was the only disability resulting from the reassignment. While Kelleher might have preferred to teach the course, "[s]ubjective impressions as to the desirability of one position over another cannot control our decision." *Lee v. Russell City Board of Education,* 563 F.2d 1159, 1162 (5th Cir.1977) (decided under stricter desegregation standard, *see infra* discussion of *Singleton* case). In our view and in that of the district court, both apparently consistent with the feelings of the other AI's in the same position as Kelleher,

employment as an AI was tolerable under the new assignment. The inability to teach Government 310–312 cannot be said to have imposed such intolerable constraints on Kelleher that she was compelled to resign.

Nor, we add, did Kelleher argue to the contrary. At no time has she argued before us that the burdens of the change were intolerable. Her argument relied solely on the much stricter standard used where demotion has resulted from attempts at desegregation. *See Singleton v. Jackson Municipal Separate School District*, 419 F.2d 1211, 1218 (5th Cir.) (en banc) (focusing inquiry on change in "responsibilities"), *cert. denied, Carter v. West Feliciana Parish School Board*, 396 U.S. 1032, 90 S.Ct. 611, 24 L.Ed.2d 530 (1970). *Singleton* and its progeny are clearly inapplicable outside the context of desegregation decisions. *Pickens v. Okolona Municipal Separate School District*, 527 F.2d 358, 361 (5th Cir.1976). The change in Kelleher's duties did not amount to a constructive discharge.

■■■ There remains, however, the issue whether Kelleher had a claim of entitlement to the specific duties to which she was assigned prior to the reassignment, namely, the opportunity to teach the Government 310–312 courses. Of this opportunity, Kelleher was surely deprived. However, the only contract or guarantee indicating that Kelleher would be permitted to teach the Government 310–312 courses was the memorandum of appointment to teach the summer course which expired of its own operation prior to the fall of 1980. No other guarantee or contract is claimed to have existed.[4] *Bishop v. Wood*, 426 U.S. at 344, 96 S.Ct. at 2077. Further, no statute or ordinance of the state of Texas supplies a basis for a claim of entitlement to the teaching position. Indeed, it is undisputed that the duties to which Kelleher was assigned for the fall of 1980, leading discussion sessions and grading papers,

were well within the bounds of the duties generally assigned to AI's at the University. Kelleher has not argued that she had a property right in the duties of which she was deprived. We hold that Kelleher had no such property right and was therefore not entitled to a hearing prior to deprivation.

### B. Liberty Interest

■■■ While Kelleher has not attempted to identify any liberty interest offended by the reassignment, we choose to address the issue in deference to her broad claim that her due process rights were violated. Mere non-renewal of an employment relationship does not constitute a deprivation of liberty. *Roth*, 408 U.S. at 575, 92 S.Ct. at 2708; *Dennis v. S & S Consolidated Rural High School District*, 577 F.2d 338, 340 (5th Cir.1978). To support a claim of a deprivation of a liberty interest, a plaintiff must show (1) that she has been stigmatized, (2) in or as a result of the "discharge" process, and (3) that the stigmatization resulted from charges made public by her employer. *Wells v. Doland*, 711 F.2d 670, 676 (5th Cir.1983). Upon this showing, the plaintiff is entitled to "a hearing to clear [her] name." *Id.* (citing *Roth*, 408 U.S. at 573–75, 92 S.Ct. at 2707–08).

■■■ It is undisputed that the University officials did not make public any charges against Kelleher. The only public revelation of the controversy surrounding Kelleher's self-termination came in an article in the campus newspaper in which Kelleher herself discussed the "charges." The district court found this to be the only occasion of the controversy's receiving public exposure. Kelleher does not challenge that finding. Additionally, the mere presence of derogatory information in confidential files does not infringe an individual's liberty interest. *Sims v. Fox*, 505 F.2d 857, 864 (5th Cir.1974) (en banc), *cert. denied,*

---

4. The memorandum, recommending that she teach in the fall of 1980, and sent in the summer of that year, was never approved by either the College Dean or the Vice President for Academic Affairs. It was, therefore, inoperative as support for a claim of entitlement since it was a mere recommendation, not a guarantee or contract. *Bishop v. Wood*, 426 U.S. at 344, 96 S.Ct. at 2077.

421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 678 (1975). Thus, "infringement of one's liberty interest can be found only where the governmental agency has made or is likely to make the allegedly stigmatizing charges public 'in any official or intentional manner, other than in connection with the defense of [related legal] action.'" *Ortwein v. Mackey*, 511 F.2d 696, 699 (5th Cir.1975) (quoting *Kaprelian v. Texas Woman's University*, 509 F.2d 133, 139 (5th Cir. 1975)) (university did not make charges public).

As for the possibility of future disclosure of any "charges", President Flawn, in his approval of Kelleher's reassignment and rejection of the Grievance Committee findings, stated that the proceedings had absolved Kelleher completely. There are, therefore, no actual "charges" to be made public and any possibility that the prior allegations of Dean Horn would be made public amounts to no more than a sliver of speculation. *See Ortwein*, 511 F.2d at 699 ("slight likelihood" is not sufficient). Since Kelleher's liberty interests were not infringed by the reassignment, she had no constitutional right to a hearing to clear her name. *Roth*, 408 U.S. at 573–75, 92 S.Ct. at 2707–08.

### IV.

Finally, Kelleher argues that the district court erred in failing to give "due weight and consideration" to the findings of the faculty Grievance Committee. The committee's findings were introduced in evidence and thus we may presume that the district court gave them some consideration.[5] The committee found no First Amendment violation. Thus, the argument can apply only to the committee's finding that Kelleher's due process rights were infringed. Moreover, the committee's due process analysis was fatally flawed inasmuch as it did not address the threshold issues of whether Kelleher even had liberty or property interests in her position. The

findings were, therefore, "due" very little weight and consideration and we may presume that the district court gave them at least that much attention. In the absence of any indication or authority that the Grievance Committee was more qualified than the district court to interpret the Fourteenth Amendment and to ferret out violations of it, and in light of the clear indication from the committee's own findings that it failed to employ the correct Fourteenth Amendment analysis, Kelleher's final argument is meritless.

For the reasons stated, the judgment of the district court in favor of all defendants is AFFIRMED.

---

**5.** How much consideration the district court gave the findings is not revealed either in the record or in Kelleher's brief.