**Fernando QVYJT, Plaintiff,**

v.

**Dr. Chhiu–Tsu LIN, Dr. Joe W. Vaughn and Dr. Morley Russell, Defendants.**

No. 94 C 50398.

United States District Court, N.D. Illinois, Western Division.

July 23, 1996.

---

Robert P. Nolan, Nolan & Herrmann, De-Kalb, IL, for plaintiff.

Iain D. Johnston, Illinois Attorney General's Office, Chicago, IL, for defendants.

## *MEMORANDUM OPINION AND ORDER*

REINHARD, District Judge.

### INTRODUCTION

Plaintiff, Fernando Qvyjt, filed an amended three-count complaint pursuant to 42 U.S.C. § 1983 against defendants, Dr. Chhiu–Tsu Lin ("Dr. Lin"), Dr. Joe W. Vaughn ("Dr. Vaughn") and Dr. Morley Russell ("Dr. Russell"). At the time the basis for this action arose, plaintiff was a graduate student at Northern Illinois University ("NIU"), and defendants were faculty members of NIU's chemistry department. Count I alleges that defendants deprived plaintiff of his property right and liberty interest in obtaining an education at NIU without due process of law. Counts II and III allege that defendants retaliated against plaintiff for exercising his First Amendment right to free speech. This court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, and venue is proper as all the alleged events occurred in this district and division. Defendants move for summary judgment on all counts.

### FACTS

■ Defendants note that all facts contained in their statement of facts filed pursuant to Local General Rule 12M are deemed admitted due to plaintiff's failure to comply with Local General Rule 12N. Local General Rule 12N provides the only acceptable means of disputing the moving parties' facts and of presenting additional facts to the court. *Midwest Imports, Ltd. v. Coval,* 71 F.3d 1311, 1317 (7th Cir.1995). Plaintiff did not

file a statement of facts consisting of short, numbered paragraphs pursuant to Local General Rule 12N(3)(a) in order to contest any fact contained in defendants' 12M statement, nor did he file a similar statement pursuant to Local General Rule 12N(3)(b) to offer any additional facts. Instead, plaintiff begins his response brief by stating that although he has "few quarrels" with defendants' statement of facts, he would make some "corrections and additions." Plaintiff then proceeds to offer the corrections and additions in the form of a narrative factual discussion, leaving this court to divine what portions of defendants' 12M statement he seeks to contest and discover the additional facts he seeks to offer. This task does not rest on the district court; rather, the task rests on the litigants, *Northwestern Nat'l Ins. Co. v. Baltes,* 15 F.3d 660, 662–63 (7th Cir.1994), and instead of scouring the record in search of factual disputes, a court may deem the facts in the 12M statement admitted, *Flaherty v. Gas Research Inst.,* 31 F.3d 451, 453 (7th Cir.1994), and may disregard the additional facts improperly submitted by the non-moving party, *Midwest Imports, Ltd.,* 71 F.3d at 1317. Accordingly, all facts contained in defendants' 12M statement are deemed admitted to the extent they are properly supported by the record, *Stewart v. McGinnis,* 5 F.3d 1031, 1034 (7th Cir.1993), *cert. denied,* 510 U.S. 1121, 114 S.Ct. 1075, 127 L.Ed.2d 393 (1994), and the additional facts set forth in plaintiff's response brief are stricken. What follows, therefore, is a summary of the facts considered for purposes of this motion. The court views these facts in the light most favorable to plaintiff, the non-moving party. *Henry v. Daytop Village, Inc.,* 42 F.3d 89, 92 (7th Cir.1994).

In 1990, plaintiff applied to NIU's graduate program in chemistry, at which time it was his desire to work with Dr. Lin. In November 1991, Dr. Lin informally became plaintiff's dissertation director and formally became his research advisor. Dr. Lin informed plaintiff about a project he was directing which involved coatings. In particular, Dr. Lin was adding phosphoric acid to paint to improve the adhesion the paint would have on metal surfaces. Plaintiff agreed to work on this project. In the spring and summer of 1992, Dr. Lin told Ping Lin, another graduate student in the chemistry department, to continue her work on the use of phenyl phosphoric acid and amines with respect to the project. In the fall of 1992, plaintiff was nominated for a Patricia Roberts Harris Fellowship, a fellowship provided by the United States Department of Education designed to support minorities and women in certain fields of study. The fellowship carried a yearly stipend of $14,000. Plaintiff received the fellowship from October 1, 1993 to September 30, 1994 and from October 1, 1994 to May 31, 1995.

On November 8, 1993, plaintiff wrote a letter to Larry R. Sill, director of the technology commercialization center at NIU, claiming that Dr. Lin misappropriated his work and engaged in other acts of research misconduct. On November 10, 1993, Dean Jerrold H. Zar ("Dean Zar"), Associate Provost for Graduate Studies and dean of NIU's graduate school, met with Dr. Vaughn, chairman of NIU's chemistry department, regarding plaintiff's allegations. The following day, Dr. Vaughn told plaintiff that he would inform Dr. Lin of the charges, after which he spoke with Dr. Lin and gave him a copy of plaintiff's charges. Pursuant to the procedures outlined in a NIU document entitled "Research Integrity at Northern Illinois University" ("Research Integrity Procedures") an informal review committee ("Review Committee") was formed, consisting of faculty members of the chemistry department, to reconcile or conciliate the dispute between the parties involved in the allegations of research misconduct. Dr. Vaughn appointed Dr. Russell, Dr. Dennis Kevil and Dr. James Erman to the Review Committee on November 15, 1993. These particular faculty members were chosen because they had not published or collaborated with Dr. Lin in his research. Dr. Vaughn was responsible for overseeing the Review Committee.

Plaintiff acknowledged receipt of the Research Integrity Procedures on November 16, 1993, and he met with the Review Committee the following day. During this meeting, Dr. Vaughn informed plaintiff that he may have to surrender his research notebooks. (To date, plaintiff has not surren-

dered his research notebooks in their entirety to Dr. Vaughn.) In December 1993, Dr. Lin responded to plaintiff's allegations by letter. On January 3, 1994, plaintiff informed Dr. Vaughn that he would not submit any material to the Review Committee regarding "P69," the formulation plaintiff claims Dr. Lin misappropriated. The Review Committee was unable to reconcile or conciliate plaintiff's allegations of misconduct, and on February 1, 1994, the committee notified both plaintiff and Dr. Lin of their inability to do so and informed plaintiff that he could refer his complaint to Dean Zar pursuant to the Research Integrity Procedures.

Plaintiff requested Dean Zar to further investigate this matter on February 7, 1994, after which a research standards inquiry committee ("Inquiry Committee") was formed. Vice President and Provost J. Carroll Moody appointed Professor Jon W. Carnahan, Professor Robin Rogers and Professor Charles W. Spangler, all faculty members of the chemistry department, to the Inquiry Committee. Pursuant to the Research Integrity Procedures, Dean Zar was a non-voting member of the committee. In addition, both plaintiff and Dr. Lin could challenge the appointment of these individuals to the Inquiry Committee. On May 18, 1994, Dean Zar provided the members of the Inquiry Committee with a memorandum describing the allegations, a copy of plaintiff's letter of November 8, 1993 and Dr. Lin's written response to the allegations. On June 6, 1994, Dean Zar informed plaintiff and Dr. Lin in separate letters that the Inquiry Committee needed more information from each of them. Dean Zar requested that the materials be provided by June 20, 1994. Dr. Lin provided all the information requested of him by that date. Plaintiff, however, did not provide the requested information by that date. On July 6, 1994, Dean Zar sent plaintiff a letter by certified mail, return receipt, informing him that the Inquiry Committee had not yet received the materials. Because plaintiff had not yet provided the materials, Dean Zar cancelled the Inquiry Committee's scheduled meeting.

Also on July 6, 1994, plaintiff's dissertation committee sent him a letter stating that his research report was insufficient to qualify as a dissertation. The dissertation committee suggested that plaintiff sever his relationship with Dr. Lin and select a new thesis advisor as well as a new, mutually acceptable, doctoral project or that plaintiff rewrite the work previously submitted and upon approval, the dissertation committee would accept the work as satisfying the requirement for a master's degree. On July 28, 1994, plaintiff informed Dr. Vaughn that he was not interested in either option suggested by the dissertation committee.

On August 2, 1994, Dean Zar received the requested materials from plaintiff. The materials were forwarded to the Inquiry Committee. The Inquiry Committee divided plaintiff's allegations into two categories—research misconduct with respect to the patent Dr. Lin was applying for and research misconduct with respect to a paper published by Dr. Lin and co-authored by plaintiff. On September 26, 1994, Dr. Vaughn wrote plaintiff a letter informing plaintiff, as he had earlier, that due to safety and liability reasons, plaintiff would not be permitted to use the laboratory for research until he selected a new dissertation advisor. On November 3, 1994, Dean Zar informed plaintiff that the Inquiry Committee had concluded that a formal investigation was warranted to review the allegations against Dr. Lin. Plaintiff was informed that the Inquiry Committee needed his research notebooks and that he should provide them within the next two weeks. To conduct a formal investigation, a separate committee was formed pursuant to the Research Integrity Procedures. This separate committee, the research standards investigation committee ("Investigation Committee"), consisted of three members of the Inquiry Committee (Carnahan, Spangler and Rogers), Dr. Larry Sill, Dr. Parviz Payvar and Dean Zar as a non-voting member. Plaintiff was permitted to challenge the selection of these members and at least one individual challenged by him was not placed on the Investigation Committee. The Investigation Committee would investigate the allegations regarding the patent; the allegations regarding the paper remained with the Inquiry Committee.

On or about November 16, 1994, plaintiff's dissertation committee informed him that he was not making satisfactory progress toward his doctorate degree. The dissertation committee informed plaintiff that he had until February 1, 1995 to select a new dissertation advisor and make progress toward his degree and warned him that failure to do so would result in a recommendation that he be terminated from the doctoral program. The dissertation committee also gave plaintiff the option of resubmitting his research report for a master's degree. Also on November 16, 1994, Dr. Vaughn informed plaintiff that Dr. Lin had formally been removed as his dissertation advisor. Despite the fact that plaintiff had found a professor from DePaul University who agreed to be a member of his dissertation committee and to serve as his advisor, plaintiff did not select a new advisor.

On January 6, 1995, Dean Zar sent plaintiff another letter on behalf of the Investigation Committee requesting his research notebooks and stating that these materials were necessary in order for the Investigation Committee to complete its review of his allegations. On January 25, 1995, the Inquiry Committee made its findings with respect to the allegations concerning the paper, concluding that Dr. Lin had not committed any research misconduct. On January 26, 1995, Dean Zar, on behalf of the Investigation Committee, requested plaintiff's research notebooks again and notified plaintiff that he had until February 10, 1995 to produce the materials, otherwise the Investigation Committee would terminate its investigation and render a conclusion based on the information provided to date. Although it does not appear that plaintiff submitted all of the requested materials, it appears that he at least submitted portions of his research notebooks to the Investigation Committee either on a prior occasion or subsequent to Dean Zar's last request. On April 4, 1995, Carnahan drafted a report after comparing portions of plaintiff's notebooks that had been submitted and Ping Lin's notebooks and the formulations contained therein. Carnahan determined that plaintiff's formulation of P69 was essentially the same formulation discovered by Ping Lin and that Ping Lin's formulation preceded plaintiff's by at least three months.

Carnahan's draft report was distributed to Vice–President Moody, plaintiff and Dr. Lin, and plaintiff and Dr. Lin were given an opportunity to comment on it. Both Dr. Lin and plaintiff responded, and on May 4, 1995, the Investigation Committee issued its final report. On May 10, 1995, Vice President Moody informed plaintiff by letter that he agreed with the findings in the Investigation Committee's final report.

Because plaintiff had failed to comply with the requirements set by his dissertation committee and the graduate program, the chemistry department recommended that plaintiff be dismissed from the doctoral program. On May 12, 1995, Dr. Carla Montgomery, Associate Dean, informed plaintiff by letter that his admission to the doctoral program in chemistry was terminated pursuant to NIU's graduate catalog. Plaintiff's termination was based on his documented failure to make satisfactory progress toward his degree. The termination was not based on his allegations made against Dr. Lin. Because one of the conditions to maintaining plaintiff's fellowship was that he make progress toward his degree, plaintiff was no longer able to receive the fellowship. Plaintiff was informed of the fellowship termination on May 31, 1995.

## CONTENTIONS

Defendants contend they are entitled to judgment as a matter of law on Count I because plaintiff was dismissed from the graduate program for academic reasons and he received adequate procedural due process. With respect to Counts II and III, defendants contend that they are entitled to judgment as a matter of law on the basis that plaintiff did not engage in a protected expression because his speech was not a matter of public concern and was false. In response, plaintiff concedes that the procedures themselves were adequate and instead contends that defendants misused the procedures as a pretext to strip him of his ability to make progress toward his degree. As to Counts II and III, plaintiff contends that his speech need not be a matter of public concern in order to be protected speech under the First Amendment. Plaintiff also con-

tends that even if this is a requirement, his speech was a matter of public concern and was not false. In reply to plaintiff's contention with respect to Count I, defendants contend that plaintiff cannot prevail on Count I because defendants' alleged misuse of the procedures was a random, unauthorized act for which plaintiff has an adequate post-deprivation state law remedy.

## DISCUSSION

Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Tyler v. Runyon*, 70 F.3d 458, 464 (7th Cir.1995). Although the court must draw all reasonable inferences in favor of the party opposing the motion, the opposing party may not simply rest on its pleadings or on mere conclusory allegations to avoid summary judgment; rather, the non-moving party must come forward with evidence to show the existence of each element of its case on which it will bear the burden at trial. *Matney v. County of Kenosha*, 86 F.3d 692, 694–95 (7th Cir.1996).

## COUNT I

■ A procedural due process claim requires two principal inquiries: first, whether the plaintiff was deprived of a protected property interest, and second, what process was due with respect to that deprivation. *Youakim v. McDonald*, 71 F.3d 1274, 1288 (7th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 2571, 135 L.Ed.2d 1087 (1996). Whether plaintiff has a protected property interest is a question which is determined by reference to state law. *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Illinois appellate courts generally regard an expected degree from a public institution as a contractual right arising from the terms of the university's catalogs. *See, e.g., Wilson v. Illinois Benedictine College*, 112 Ill.App.3d

932, 937, 68 Ill.Dec. 257, 262, 445 N.E.2d 901, 906 (2d Dist.1983); *Alexander v. Kennedy–King College*, No. 88 C 2117, 1990 WL 179691 (N.D.Ill. Nov. 2, 1990) (Rovner, J.) (collecting Illinois cases). Since there is at least an arguable basis that a property interest can be derived from such implied contracts, *see Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 222 n. 7, 106 S.Ct. 507, 512 n. 7, 88 L.Ed.2d 523 (1985), and defendants have not contested this issue, the court assumes the existence of such an interest for purposes of this motion.

■ The next inquiry, therefore, is what level of process is due plaintiff. Due process is a flexible concept that varies with the particular situation. *Doherty v. City of Chicago*, 75 F.3d 318, 323 (7th Cir.1996). In the context of academic decisions, such as a dismissal from an institution for academic reasons (as opposed for disciplinary reasons), the level of process is minimal. *See Board of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 86, 98 S.Ct. 948, 953, 55 L.Ed.2d 124 (1978). Although the Supreme Court has not declared what the absolute minimal requirements are in such context, the Court has specifically found that no hearing is required. *Id.* at 90, 98 S.Ct. at 955. From there, the Court has directed lower courts to consider three distinct factors in determining whether a sufficient level of process has been afforded. *Id.* at 86 n. 3, 98 S.Ct. at 953 n. 3. These factors are the private interest that will be affected by the official action, the risk of an erroneous deprivation of such interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards and the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail. *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

This present case does not present this court with the need to consider these factors, as plaintiff concedes that the procedures in place were adequate.[1] Instead of challenging

---

1. While defendants offer evidence with respect to both the Research Integrity Procedures and the procedures in which plaintiff was dismissed from

the graduate program, the only relevant procedures are those concerning plaintiff's dismissal, as there is no evidence that an adverse finding

the adequacy of the procedures, plaintiff claims that defendants "used the process to strip him of the ability to make appropriate academic progress, and then on finding that no progress was being made, terminated him from the school." Plaintiff claims that defendants used the process to retaliate against him for the complaints of misconduct.[2] While plaintiff has not exhibited any effort to further elaborate upon this claim, the court regards this as a claim that the process afforded him was not meaningful because of defendants' improper motivation.

At the outset, the court makes the following observation. If it is plaintiff's theory that he was denied procedural due process because defendants misused procedures in order to prevent him from making progress toward his degree, resulting in his dismissal, he has not come forth with any affirmative evidence that suggests this in fact occurred. Plaintiff alleges in his amended complaint that he was called to a meeting with Dr. Vaughn and Dr. Russell on December 16, 1993 and told that he must choose a new advisor and dissertation topic and that he was barred from using NIU's chemicals and equipment. In their answer, defendants admit he was told to choose a new advisor but deny the remaining allegations. With respect to this motion, neither plaintiff nor defendants address this meeting, why plaintiff was told that he must choose a new advisor or if and when plaintiff was first barred from using the laboratory.[3] The first indication in the record (referenced in support of this motion) as to when Dr. Lin was informally removed as his advisor appears in the dissertation committee's letter dated July 6, 1994, after plaintiff had submitted his research report as a dissertation and after it was rejected. The dissertation committee's

letter is cryptic as to why it recommended that plaintiff select a new advisor, and defendants have not offered any evidence which explains the letter. Similarly, Dr. Vaughn's letter of September 26, 1994 addressed to plaintiff is the first evidence of his being barred from the laboratory, stating "[a]s you were told some months ago, due to safety and liability considerations, you will not be able to carry out any laboratory research until you have selected a new Ph.D. advisor." Just when plaintiff was previously informed of this "some months ago" is not entirely clear; it could have been the July 6, 1994 letter from the dissertation committee, or it could have been the December 16, 1993 meeting—there is no clear evidence either way, and, again, the parties are of no help on this issue either. If plaintiff was unable to complete his research prior to the submission of his dissertation as a result of being barred from the laboratory as he claims, thereby causing his research report to be insufficient, there is simply no evidence submitted in connection with this motion to this effect. Absent such evidence, the record before the court for purposes of this motion merely shows that his dissertation was rejected on its merits and does not support plaintiff's claim that defendants misused "the process" to inhibit progress towards his degree, as he was given ample opportunity to select a new advisor and topic and was not dismissed from the graduate program until he had failed to select an advisor by the February 1995 deadline. This would arguably be a basis entitling defendants to judgment as a matter of law on Count I, and even perhaps on Counts II and III as well. Nonetheless, defendants do not seek judgment as a matter of law on this basis, and the court, therefore, expresses no opinion on the merits of this issue other

from any of the various research integrity committees could result in plaintiff's dismissal. Thus, were this court to address the adequacy of the procedures in this case, it would not consider the Research Integrity Procedures.

2. The court notes that plaintiff's contention in this respect is rather vague and difficult to discern. The best the court can make of this contention is that he is indirectly claiming that defendants were prejudiced against him for bringing allegations of misconduct against Dr. Lin.

3. While plaintiff states in his response brief that after Dr. Lin was removed as his dissertation advisor, he was barred from using the laboratory and cites to pages 43 and 45 of Dr. Vaughn's deposition, he does not give the court any guidance as to *when* this occurred. In addition, these referenced portions of the record do not even support his general factual contention with respect to Dr. Lin's removal or plaintiff's being barred from the laboratory.

than to note plaintiff's rather glaring lack of proof.

■ Regardless of whether plaintiff could offer sufficient evidence to show that defendants used established procedures improperly so as to prevent him from making progress towards his degree, such conduct would amount to "random and unauthorized" conduct, which violates the Due Process Clause only if there is no adequate post-deprivation state law remedy. *See Doherty,* 75 F.3d at 323. Plaintiff has not alleged or argued, let alone demonstrated, that the remedies provided by the state of Illinois are inadequate, and his failure to do so is fatal to his claim. *Id.* 323–24. Plaintiff could have brought a breach of contract claim in state court against NIU, *see, e.g., Frederick v. Northwestern Univ. Dental Sch.,* 247 Ill. App.3d 464, 187 Ill.Dec. 174, 179, 617 N.E.2d 382, 387 (1st Dist.), *appeal denied,* 152 Ill.2d 558, 190 Ill.Dec. 887, 622 N.E.2d 1204 (1993); *Wilson,* 68 Ill.Dec. at 262, 445 N.E.2d at 906, and there is no indication that a remedy from such an action would have been inadequate. Accordingly, defendants are entitled to judgment as a matter of law on Count I, as plaintiff has not challenged the post-deprivation remedies available under state law.[4]

### COUNTS II & III

■ As to Counts II and III, defendants contend that in order for plaintiff's speech to be protected, it must be a matter of public concern. Defendants urge this court to apply the principles of *Pickering v. Board of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) and *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), each involving speech of public employees, to this case. In so urging, defendants rely on *Siblerud v. Colorado State Bd. of Agric.,* 896 F.Supp. 1506 (D.Colo.1995) and *Kelleher v. Flawn,* 761 F.2d 1079 (5th Cir. 1985).

*Pickering* and *Connick* represent an established body of precedent relating to government employment and government employees' rights to engage in activities protected by the First Amendment. These cases hold that the First Amendment's guarantee of freedom of speech protects government employees' speech on matters of public concern but not on matters of private concern. *Connick,* 461 U.S. at 147, 103 S.Ct. at 1690. Recently, the Court has extended the application of these precedents to independent contractors of federal, state or local governments. *See Board of County Comm'r, Wabaunsee County v. Umbehr,* — U.S. —, —, 116 S.Ct. 2342, 2347, 135 L.Ed.2d 843 (U.S.1996). In extending *Pickering* and *Connick* to independent contractors, the court relied on the similarities between government employees and independent contractors, stating that the "government needs to be free to terminate both employees and contractors for poor performance, to improve the efficiency, efficacy and responsiveness of service to the public, and to prevent the appearance of corruption." *Id.* at —, 116 S.Ct. at 2347.

■ To apply *Pickering* and *Connick* to a graduate student enrolled in a public university, however, would require the court to ignore a substantial body of First Amendment jurisprudence of equal magnitude. *See, e.g., Tinker v. Des Moines Indep. Community Sch. Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); *Healy v. James,* 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); *Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988). The Supreme Court has long held that state-operated schools may not be "enclaves of totalitarianism," *Tinker,* 393 U.S. at 511, 89 S.Ct. at 739, and has recognized the college environment, in particular, to be "the marketplace of ideas." *Healy,* 408 U.S. at 180, 92 S.Ct. at 2346. While students' rights

---

4. It should be noted that the court does not interpret plaintiff's claim in Count I to be based on substantive due process even though it makes a reference that his property cannot be "arbitrarily and capriciously taken away from him." If plaintiff is advancing a substantive due process claim in addition to his procedural due process claim, it would be news to both this court and defendants, as he has not made any argument to this effect. Moreover even if this court has somehow misperceived his rather legally vague contentions and he is advancing such a claim in Count I, he has not alleged, argued or shown either the inadequacy of state law remedies or an independent constitutional violation in Count I. *Doherty,* 75 F.3d at 326.

are not necessarily co-extensive with the rights of adults in other settings, their expressions will generally be protected as long as they do not "materially and substantially interfere with the requirements of appropriate discipline" or collide with the rights of others. *Tinker*, 393 U.S. at 513, 89 S.Ct. at 740.

Here, plaintiff lodged allegations of misconduct against his doctoral advisor. Defendants would have this type of speech protected only if it was a matter of public concern. It would be incredulous to think that the university has carte blanche to retaliate against any student as long as the speech was of a private concern or was made to vindicate the student's private interest. Defendants' position, if adopted, would have a significant chilling effect upon students' ability to express their opinions, beliefs and ideas. Defendants have not submitted, nor is this court aware of, any controlling authority which would limit students' protected speech to matters of public concern. The governmental interests present in an employer-employee relationship, which led the Supreme Court to extend *Pickering* and *Connick* to independent contractors, are not present in a student-university relationship.

The court is not persuaded by defendants' reliance on *Kelleher* and *Siblerud*. In *Kelleher*, the plaintiff was an assistant instructor in addition to being a graduate student and was reassigned to a different teaching assignment allegedly in retaliation for expressing political opinions in the courses she was teaching. *Kelleher*, 761 F.2d at 1082–83. Thus, the retaliation arose from her activities as an employee of the university making the court's application of government employment precedents appropriate. No similar facts are present here, as plaintiff engaged in his expression as a student and his status as a student allegedly suffered as a result. Similarly, *Siblerud* involved a student who misrepresented his association with the university after being warned not to do so. *Siblerud*, 896 F.Supp. at 1509. The court distinguished *Tinker*, stating that his expression did not involve the expression of opinions, beliefs or values. *Id.* at 1518. Instead, the speech at issue in *Siblerud* was in direct

violation of a valid disciplinary measure due to his suspended academic standing, *id.* at 1519, and it is on this basis that the court finds *Siblerud* distinguishable. Accordingly, the court declines to apply *Connick* to plaintiff's speech in this case and therefore rejects it as a basis for granting defendants' motion on Counts II and III.

Defendants also contend that plaintiff did not engage in protected expression because plaintiff's speech was false and made with actual malice, relying on the principle that government employees' speech is not protected if it is false and made with actual malice even if it involves a matter of public concern. *Brenner v. Brown*, 36 F.3d 18, 20 (7th Cir. 1994). Plaintiff contends that his speech was protected because it was true and involved a matter of public concern.

 Generally, the inquiry into the protected status of speech is one of law, not fact. *Connick*, 461 U.S. at 148 n. 7, 103 S.Ct. at 1690 n. 7. In defamation cases, however, the determination of whether the speaker acted with actual malice is made by the trier of fact. *See, e.g., Libbra v. City of Litchfield*, 893 F.Supp. 1370, 1378 (C.D.Ill.1995). Although defendants rely on *Libbra* for the proposition that the inquiry into the existence of actual malice is subsumed in this court's inquiry into the protected status of plaintiff's speech, making the issue of actual malice an issue of law, *Libbra* did not so find; rather, the court in *Libbra* avoided resolution of this legal dilemma by finding actual malice as a matter of law (*i.e.*, no rational trier of fact could find otherwise). *See id.* at 1378. Like the district court in *Libbra*, this court need not resolve this issue, as the facts presented by defendants do not support a finding of actual malice.

 A statement is made with actual malice if it is made with knowledge of falsity or reckless disregard for the truth. *Brenner*, 36 F.3d at 20. Defendants present uncontradicted evidence that Pin Lin, under the direction of Dr. Lin, developed a formulation essentially similar in nature to plaintiff's P69 formulation at least three months prior to plaintiff's development of P69. While this evidence, assumed to be true for purposes of this motion, might support the conclusion

that Dr. Lin did not misappropriate plaintiff's formula,[5] it does not show plaintiff was aware of Pin Lin's prior development of this formula or that he knew Dr. Lin based the patent application on Pin Lin's research. The evidence simply does not show plaintiff acted with either knowledge of falsity or reckless disregard for the truth. Thus, even if it was the duty of this court to resolve the issue of actual malice, it could not resolve it in favor of defendants on the record before it. Accordingly, defendants' motion is denied with respect to Counts II and III.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted with respect to Count I and denied with respect to Counts II and III.

---

**5.** While the record establishes that Pin Lin's discovery predated plaintiff's, it is silent on whether Dr. Lin based his patent solely on Pin Lin's research.